ROBERT PETERSON and )
LEIBUNDGUTH STORAGE & )
VAN SERVICE, INC., )
  )
  Plaintiffs, )    No. 14 C 9851
  )
  v. )    Judge Edmond E. Chang
  )
VILLAGE OF DOWNERS GROVE, )
  )
  Defendant. )
  )

## MEMORANDUM OPINION AND ORDER

Plaintiffs Robert Peterson and Leibundguth Storage & Van Service, Inc. sued the Village of Downers Grove to challenge the constitutionality of the Village's Sign Ordinance. R. 1, Compl.[1] Plaintiffs contend that several sections of the Village's revised Ordinance, which was originally adopted in 2005 but later amended, violate the First and Fourteenth Amendments, as well as Article I, Section 4 of the Illinois Constitution.[2] Plaintiffs focus their challenge on the following restrictions in the Sign Ordinance: its restriction on painted wall signs, on signs that do not face a roadway or drivable right-of-way, and on the total sign area and number of wall signs permitted on a single lot. *Id.* Earlier in the case, the Court dismissed Peterson as named plaintiff (because really his corporation is the sole proper plaintiff), R. 29 at 10-12 (April 2015 Opinion), leaving Leibundguth Storage & Van Service, Inc. as

---

[1] Citations to the record are "R." followed by the docket number then the page or paragraph number.

[2] This Court has subject-matter jurisdiction over the federal issue under 28 U.S.C. § 1331, and supplemental jurisdiction over the state-law claim under 28 U.S.C. § 1367(a).

the only remaining plaintiff. Both parties have now moved for summary judgment. R. 35, Def.'s Mot. for Summ. Judgment; R. 39, Pl.'s Mot. for Summ. Judgment. For the reasons set forth below, the Court grants the Village's motion, and denies Leibundguth's.

## I. Background

The nature of Leibundguth's claims are set forth in detail in the April 2015 opinion [R. 29] that denied the Village's motion to dismiss. *Peterson et al v. Village of Downers Grove*, 2015 WL 1929737, at *1-3 (N.D. Ill. April 27, 2015). The relevant facts are largely undisputed.

### A. Leibundguth's Signs

Robert Peterson is a resident of Downers Grove, Illinois. R. 38-4, Exh. 5, Peterson Depo. at 15. He has owned Leibundguth Storage & Van Service, Inc., which provides moving and storage services, since the mid-1980s. *Id.* at 24. Leibundguth operates out of a building located between Warren Avenue and the Metra commuter-railway tracks in the Village of Downers Grove. R. 40, PSOF ¶ 5.[3]

On the building's north and south facing walls, signs can be found advertising Leibundguth's business. On the south wall, a sign has been painted

---

[3]Citations to the parties' Local Rule 56.1 Statements of Fact are "DSOF" (for the Village's Statement of Facts) [R. 37; R. 38]; "PSOF" (for Leibundguth's Statement of Facts) [R. 40]; "Pl.'s Resp. DSOF" (for Leibundguth's Response to the Village's Statement of Facts) [R. 40]; and "Def.'s Resp. PSOF" (for the Village's Response to Leibundguth's Statement of Facts) [R. 46]. In several instances, the parties submitted their Statement of Facts and their responses/replies to the opposing party's Statement of Facts in a single document. As a point of clarification, the paragraph numbers referenced in the Court's citations to these Statements refer to that portion of the document being referenced. For example, PSOF ¶ 1 refers to paragraph 1 of Leibundguth's Statement of Facts, which begins on page 16 of R. 40. Finally, where a fact is admitted, only the asserting party's statement of facts is cited; where an assertion is otherwise challenged, it is so noted.

directly onto the brick, which reads "Leibundguth Storage and Van Service / Wheaton World Wide Movers." PSOF ¶ 7; R. 10, Am. Compl. ¶ 16; Peterson Depo., Exh. B at 10. The company's phone number is also listed. Am. Compl. ¶ 16. The sign looks like this:



*Id.* ¶ 1. The sign is 40 feet long, 10 feet high, and is directly visible to commuters riding by on Metra trains into and out of Chicago. *Id.* ¶ 16; PSOF ¶ 7. The sign does not face a roadway and is not visible to drivers. Am. Compl. ¶ 17; PSOF ¶ 5. According to Leibundguth, this sign brings in around 12 to 15 potential new customers each month, and generates between $40,000 and $60,000 in revenue per year, or about 15 to 20 percent of the company's annual revenue. Am. Compl. ¶ 18; PSOF ¶ 16.

On the front of the building, which faces north, Leibundguth has several signs. Leibundguth has another painted wall sign, which lists the company's name and phone number. Am. Compl ¶ 19; PSOF, ¶ 9. This sign is 40 feet long and 2 feet high, and is visible to drivers. Am. Compl. ¶ 19. It looks like this:



*Id.*

Leibundguth also has a separate sign (also on the front of the building) which spells out the company's name, "Leibundguth Storage & Van Service," in red and white (primarily white) hand-painted block letters. PSOF ¶ 11; Am. Compl. ¶ 21. Directly beneath those words is a rectangular sign, which advertises Leibundguth's relationship with "Wheaton World Wide Moving," a long-distance mover. PSOF ¶ 12. Neither of these signs is painted directly onto the building's exterior, but both face a roadway and can be seen by drivers. Am. Compl. ¶ 22. The portion of the sign spelling out the company's name is 19 feet long by two feet high, and the portion referencing Wheaton World Wide Moving is seven feet long by four feet high. Am. Compl. ¶¶ 20-21. These signs look like this:



*Id.* ¶ 21. The parties dispute whether the pictured sign(s) are one sign or two. Leibundguth argues two; the Village, one. PSOF ¶ 6; R. 46, Def.'s Resp. to PSOF ¶¶ 6, 11-12. In total, Leibundguth's signs cover more than 500 square feet of the building. Am. Compl. ¶ 42 (Leibundguth suggests they cover about 550 sq. ft.); R. 12, Ans. to Am. Compl ¶¶ 16, 19-20 (the Village asserts they cover about 665 sq. ft.).

## B. The Village's Sign Ordinance

In May 2005, the Village of Downers Grove amended its sign ordinance, reducing the amount of signage permitted and prohibiting certain types of signs altogether. DSOF ¶ 15. (The Village's sign ordinance is contained in Article 9 of the Village's municipal code; for convenience's sake, this Opinion will refer to Article 9 as the "Sign Ordinance.") The Sign Ordinance's stated purpose is "to create a comprehensive but balanced system of sign regulations to promote effective communication and to prevent placement of signs that are potentially harmful to motorized and non-motorized traffic safety, property values, business opportunities and community appearance." R. 38-1, Exh. 2, Sign Ord. § 9.010(A).

Three of the Sign Ordinance's restrictions directly apply to Leibundguth's signs by banning *painted* wall signs; setting a cap on *total square footage* of signage; and setting a cap on the total *number* of wall signs. More specifically, the Ordinance prohibits "any sign painted directly on a wall, roof, or fence." *Id.* § 9.020(P). It limits the "maximum allowable sign area" for each property to 1.5 square feet per linear foot of frontage (two square feet per linear foot if the building is set back more than 300 feet from the street), in no case to "exceed 300 square feet in total sign surface

area." *Id.* § 9.050(A). And finally, it limits the number of wall signs a lot may display to "one wall sign per tenant frontage along a public roadway or drivable right-of-way." *Id.* § 9.050(C)(1). As originally enacted, this last provision prevented a property owner from displaying a sign facing the BNSF railroad, because such a sign would not be facing a roadway or drivable right-of-way. After Leibundguth filed this lawsuit, however, the Village amended this portion of the ordinance to allow "lots with frontage along the BNSF railroad" to display "one additional wall sign" facing the railroad, but limited the sign area to 1.5 square feet per linear foot of frontage along the BNSF railroad right-of-way. Def.'s Br., Exh. B, Am. Sign Ord. § 9.050(C)(5).

Leibundguth also points to § 9.030 of the Village's Sign Ordinance to show that the restrictions that apply to it are content-based. Pl.'s Br. at 16-20. Section 9.030 of the Sign Ordinance exempts certain signs—not Leibundguth's—from needing to obtain a sign permit and subjects those signs, which it identifies based on the type of sign being displayed, to different size restrictions. Sign Ord. § 9.030. For example, it exempts (among other signs) Governmental Signs, Railroad and Utility Signs, Street Address Signs, Noncommercial Flags, Real Estate Signs, Decorations displayed in connection with a Village-sponsored event, "No Trespassing" Notices, "Political and noncommercial signs," and "Memorial signs and tablets" from needing to obtain a permit. *Id.* Some of the listed exemptions remain subject to size restrictions, such as "Political and noncommercial signs," which "may not exceed a maximum area of 12 square feet per lot," *id.* § 9.030(I), while others are

not subject to any size restrictions at all, such as Governmental Signs and Noncommercial Flags, *id.* § 9.030(A), (G). None of the listed exemptions, however, are subject to the one wall-sign restriction in § 9.050(C) that Leibundguth is. The Village says that all signs (whether exempted under § 9.030 or not) remain subject to the prohibitions laid out in § 9.020, including the restriction on painted wall signs found in § 9.020(P) (but the square-footage and number-of-signs restrictions are not in § 9.020, so those restrictions do not apply to the exempted signs). DSOF ¶ 6.

Leibundguth's signs violate the Sign Ordinance in a number of ways. The Ordinance's ban on signs painted directly onto walls makes Leibundguth's Metra-facing advertisement and its similar, smaller sign on the front of the building unlawful. PSOF ¶¶ 8-9. The Ordinance also only allows the company 159 square feet for all of its signs (calculated at 1.5 square feet per linear foot of frontage, because Leibundguth's building is not set back more than 300 feet from the street), far less than the more than 500 square feet of advertising the company currently displays. PSOF ¶¶ 8-9, 13; Am. Compl. ¶ 41. And, according to Leibundguth, the Ordinance also prohibits its combined block-letter wall sign and Wheaton World Wide Moving sign, because only one wall sign can be displayed on a given wall and these signs constitute two signs. PSOF ¶¶ 11-13. The Village, of course, disputes this last point, whether Leibundguth's block-letter wall sign and Wheaton World Wide Moving sign constitute one or two signs. Def.'s Resp. PSOF ¶¶ 11-12.

When enacted, the Sign Ordinance established a grace period, giving property owners and businesses until May 2014 to bring any non-conforming signs

into compliance. DSOF ¶¶ 15-16; R. 37-4, Exh. 1D at 349, 352[4]. During that time, Leibundguth applied with the Downers Grove Zoning Board of Appeals for a variance that would allow the company to have a Metra-facing sign, painted wall signs, and total signage area that exceeded the maximum allowed under the ordinance. PSOF ¶ 18; R. 40-5, Exh. D at 2. The Zoning Board denied Leibundguth's request, and instead gave Leibundguth a four-month window (until April 2014) in which to paint over its painted wall signs with a solid color. PSOF ¶¶ 18-19; R. 40-2, Exh. A at 2-9. With the compliance period long over, and with Leibundguth's signs still not in compliance, Leibundguth could face fines of up to $750 per violation per day. Am. Compl. ¶ 63; R. 10-5, Exh. E, Village Muni. Code § 1.15(a). The Village has, however, agreed not to enforce the Sign Ordinance against Leibundguth and not to assess any fines during the pendency of these summary judgment motions. R. 11, Minute Entry dated Jan. 30, 2015.

### C. The Lawsuit

Leibundguth (and at the time, Peterson too) sued the Village in December 2014. R. 1, Compl. In Count One of Leibundguth's amended complaint, Leibundguth challenges the "sign ordinance's content-based restrictions." Pointing to § 9.030 explicitly and § 9.050 implicitly, Leibundguth alleges that the size and number restrictions included in the Village's Sign Ordinance are impermissible content-based restrictions that violate the First Amendment. R. 10, Am. Compl. ¶¶ 65-74. In Counts Two, Three and Four, Leibundguth challenges the Sign Ordinance's ban on painted wall signs; its ban on signs that do not face a roadway or drivable right-of-

---

[4]The page numbers associated with Exhibit 1D refer to the pagination in the PDF.

way (this provision has since been amended); and its limit on total signage area and on the number of permitted wall signs. *Id.* ¶¶ 75-95. According to Leibundguth, these restrictions violate the First Amendment because the Village lacks "a compelling, important, or even rational justification" for them, because they are not narrowly tailored to advance the Village's purported interests in traffic safety and aesthetics, and because they are more extensive than necessary to advance the Village's interests. *Id.* ¶¶ 77-80, 84-87, 91-94. Leibundguth seeks a declaratory judgment that the Sign Ordinance violates the First and Fourteenth Amendments of the United States Constitution and Article I, Section 4 of the Illinois Constitution; a permanent injunction against enforcing the Sign Ordinance; one dollar in nominal damages; and costs and attorneys' fees. *Id.* ¶¶ A-G.

## II. Legal Standard

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be

admissible in evidence" at trial, Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. On cross motions for summary judgment, the Court assesses whether each movant has satisfied the requirements of Rule 56. *See Cont'l Cas. Co. v. Nw. Nat'l Ins. Co.*, 427 F.3d 1038, 1041 (7th Cir. 2005); *see also Laskin v. Siegel*, 728 F.3d 731, 734 (7th Cir. 2013).

### III. Analysis

Leibundguth challenges the following restrictions in the Village's Sign Ordinance, which impact Leibundguth's signs: its restriction on painted wall signs, *see* Sign Ord. § 9.020(P); its requirement that wall signs face a roadway or drivable right-of-way, *id.* § 9.050(C); and its restriction on the maximum total sign area permitted on a given lot and on the number of wall signs that may displayed on a building, *id.* § 9.050(A) and (C). Leibundguth argues in the alternative that, in the event the Court finds that these restrictions do not violate the First Amendment as applied to Leibundguth, they nonetheless constitute facially impermissible content-based restrictions on speech. Pl.'s Br. at 16.

### A. Painted Wall Signs

Leibundguth's first challenge is to the Sign Ordinance's restriction on painted wall signs. Sign Ord. § 9.020(P). This section prohibits "any sign painted directly on a wall, roof, or fence." *Id.* According to Leibundguth, this section violates the First Amendment because it does not advance "a compelling, important, or even rational" government interest, and it is not narrowly tailored to serve the Village's purported interests in traffic safety and aesthetics. Pl.'s Br. at 2.

Neither party disputes whether signs are a form of expression protected by the First Amendment, and for good reason. *See City of Ladue v. Gilleo*, 512 U.S. 43, 48 (1994) (noting that "signs are a form of expression protected by the Free Speech Clause" of the First Amendment). The Supreme Court has explained, however, that signs "pose distinctive problems that are subject to municipalities' police powers. Unlike oral speech, signs take up space and may obstruct views, distract motorists, displace alternative uses for land, and pose other problems that legitimately call for regulation." *Id.* Thus, municipalities, like the Village, generally may "regulate the physical characteristics of signs," within reasonable bounds. *Id.*

Both parties agree that the Sign Ordinance's ban on painted wall signs constitutes a time, place, and manner restriction. Pl.'s Br. at 2; Def.'s Br. at 7. The Village may enforce a time, place, and manner restriction without violating the First Amendment if the restriction is: (1) content-neutral, (2) narrowly tailored to serve a significant government interest, and (3) leaves open ample alternative channels of communication. *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288,

293 (1984); *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989); *DiMa Corp. v. Town of Hallie*, 185 F.3d 823, 828 (7th Cir. 1999). The Village bears the burden of proving that its restriction on painted wall signs meets these requirements. *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 816 (2000).

As to the first element, the Village has satisfied its burden: its ban on painted wall signs, § 9.020(P), is content-neutral. To be content-neutral, a regulation must not restrict speech "because of its message, its ideas, its subject matter, or its content." *Reed v. Town of Gilbert*, 135 S.Ct. 2218, 2226 (2015). If a regulation "appl[ies] to particular speech because of the topic discussed or idea or message expressed," then that regulation is content-based. *Id.* at 2227. Likewise, if the government adopts a regulation of speech "because of disagreement with the message [the speech] conveys," then that regulation is similarly content-based. *Ward*, 491 U.S. at 791.

In this case, the Village's restriction on painted wall signs "is wholly indifferent to any specific message or viewpoint," *Weinberg*, 210 F.3d at 1037; it applies to *all* signs, regardless of their message or content. The first step to understanding this is to recognize that the Village's Municipal Code broadly defines a "sign" as:

> Any object, device, display or structure … that is used to advertise, identify, display, direct or attract attention to an object, person, institution, organization, business, product, service, event, or location by any means including words, letters, figures, designs, symbols, fixtures, colors, or illumination whether affixed to a building or separate from any building.

R. 40-6, Exh. E, Village Muni. Code § 15.220. This expansive definition does not on its face refer to the content of speech, either by singling out a *viewpoint* or a

particular *topic* of speech. Next, the Village regulates signs in Article 9 of the Municipal Code (this Opinion has been calling Article 9 the "Sign Ordinance" for convenience). After setting forth the Sign Ordinance's general purpose, *see* Sign Ord. § 9.010, the Ordinance then bans certain types of signs, again without reference to the viewpoint or topic of the sign's message. Entitled "Prohibited Signs and Sign Characteristics," Section 9.020 sets out 21 categories of banned signs, including "any sign painted directly on a wall, roof, or fence." § 9.020(P) (as amended).[5] There is no exception in Section 9.020: all painted wall signs are banned, regardless of a sign's content.

It is true that the next section of the Sign Ordinance, § 9.030, exempts certain types of signs from being subject to the Village's permit application and fee requirements—and the exemptions do, in some instances, refer to the content of the signs. To back-up for a moment, the Sign Ordinance does generally require that persons who want to display a sign apply for a permit to do so. Sign Ord. § 9.080(A). Unless the Sign Ordinance "expressly" says otherwise, "all signs require a permit." § 9.080. The permit-application process includes a "plat of survey" and a permit fee. § 9.080(A), (B). A copy of the application, which apparently is used for a wide variety of Village-required permits and thus is not specific to signs, is attached to this Opinion, as is the schedule of user fees. There is nothing more specific in the Sign Ordinance about the requirements for issuance of a permit, but in the same section, the Sign Ordinance does require that signs (a) conform with the National

---

[5]In July 2015, the Village amended this section to remove a previous exception for certain business districts in the Village. R. 36-2, Exh. B, Am. Sign Ord.

Electrical Code (if the sign has electrical wiring and connections); (b) be designed and constructed to withstand wind pressure of at least 40 pounds per square foot and to receive "dead loads" as required in the Village's building code; and (c) for signs that extend over, or could fall on, a public right-of-way, the applicant must agree to indemnify the Village and to obtain certain insurance coverage. § 9.080(C), (D), (E). So the Sign Ordinance does require a permit-application process for signs, absent an express exemption.

Returning to Section 9.030, that particular section does exempt certain types of signs from the permit-application process. And, as noted earlier, some of the exemptions do refer to the content of the signs. *E.g.*, § 9.030(B) (public-safety signs), § 9.030(E) (temporary signs at a residence commemorating a "personal" event, such as a birthday), § 9.030(G) ("Noncommercial flags" of a government), § 9.030(I) ("Political signs and noncommercial signs," within certain size limits). But that does not mean that the ban on painted wall signs—contained in § 9.020 of the Sign Ordinance—is content-based. The ban applies to *all* signs, even those that are not subject to the permit-application requirement. Nothing in the text of § 9.020 suggests that the prohibited signs in that section are anything but completely banned, even if the sign is one of the types exempted in § 9.030. In other words, the only thing that § 9.030 does in categorizing certain types of signs is to exempt those signs from the permit-application process. For example, if someone wanted to display a political or noncommercial sign, the sign would be exempt from the permit-application process (assuming it met the other requirements detailed in

§ 9.030), but § 9.020 would still ban the sign from being painted directly on a wall. Nor is there anything in the text of either § 9.030 or § 9.080 that purports to override the complete ban of § 9.020. So the painted-wall ban does not single out a certain message for different treatment, nor does it require consideration of the content of the speech in order to apply it.[6] There is also no evidence to suggest that the Village adopted this restriction because of disagreement with the messages conveyed in painted wall signs. Accordingly, because the Village's restriction on painted wall signs applies to all signs, regardless of their content, the restriction is content-neutral.

The Court must next consider whether the Ordinance's restriction on painted wall signs is narrowly tailored to achieve a significant government interest. It is this prong that the parties most contentiously dispute. The Village generally asserts that two governmental interests underlie the restrictions in its Sign Ordinance: traffic safety and aesthetics. *See* Def.'s Br. at 8-9. The Village then specifies, in a

---

[6]In resisting the content-neutral text of the Sign Ordinance's ban against painted wall signs, Leibundguth points to a Staff Report authored by the Village's Planning Manager, Stanley Popovich. According to Leibundguth, the report shows that flags and murals are allowed to be painted directly on walls. Pl.'s Br. at 3; R. 47, Pl.'s Reply Br. at 6. The report was submitted as a recommendation on the proposed 2015 amendments to the Sign Ordinance. *See* R. 36-2, Exh. B, 2015 Staff Report. In the report, Popovich does say that purely "decorative" flags and murals are not subject to the ban. 2015 Staff Report at 3 ("There are instances of flags and murals painted on buildings and these are permitted by the code on the basis that they are decorative, and do not convey constitutionally protected commercial or non-commercial speech."). But the report simply states that conclusion without any discussion of the Sign Ordinance's text. *See id.* As discussed above, the actual text of the pertinent provisions of the Sign Ordinance contains no exception to the ban on painted wall signs. Indeed, the Village concedes that flags and murals that meet the definition of a "sign" *are* subject to the painted wall sign restriction. R. 45, Def.'s Reply and Resp. Br. at 1. In light of municipal code's broad definition of a "sign," *see* R. 40-6, Exh. E, Village Muni. Code § 15.220, it is difficult to conceive of a flag or mural that would not be considered a "sign," despite the note in the Staff Report.

footnote, that "[f]or purposes of Section 9.020.P" the relevant governmental interest is "solely … aesthetics." *Id.* at 8 n.4.[7] Based on that concession, the Court will focus its analysis on aesthetics only. It is well settled that a town's interest in aesthetics is a significant governmental interest. *Members of the City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 805-06 (1984) ("it is well settled that the state may legitimately exercise its police powers to advance esthetic values … [and] municipalities have a weighty, essentially esthetic interest in proscribing intrusive and unpleasant formats for expression."); *see also Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 507-08 (1981) (describing both "traffic safety" and "the appearance of the city" as "substantial government goals"). So the *significance* of the government interest is satisfied—the only question is whether the Village's ban on painted wall signs is narrowly tailored to further that aesthetic interest.

"A regulation is narrowly tailored if it 'promotes a substantial government interest that would be achieved less effectively absent the regulation.'" *Weinberg*, 310 F.3d at 1040 (quoting *Ward*, 491 U.S. at 799). "[A]n ordinance need not be the least restrictive method for achieving the government's goal" in order to satisfy the narrowly tailored prong. *Id.* Although the Village cannot "blindly invoke" its concerns without more, *Weinberg*, 310 F.3d at 1038, the burden to put forth evidence supporting a content-neutral speech restriction of this kind is "not

---

[7]The Village's concession on this point is oddly worded; it says that the "focus of this pleading" (its brief) is "solely on aesthetics." Def.'s Br. at 8 n.4. Regardless of what is meant by that, even if the Village *did* want to rely on traffic safety as a purported justification for the painted wall sign ban, the Village develops no argument and points to no record evidence that *painted* wall signs pose some special traffic-safety problem that differs from non-painted signs.

overwhelming," *DiMa Corp.*, 185 F.3d at 829. For example, "[t]he First Amendment does not require a city, before enacting such an ordinance, to conduct new studies or produce evidence independent of that already generated by other cities, so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses." *Id.* (internal quotation marks omitted). *See also City of Watseka v. Illinois Public Action Council*, 796 F.2d 1547, 1554 (7th Cir. 1986).

Leibundguth's primary challenge is to the sufficiency of the evidence offered by the Village to justify its need for its restriction on painted wall signs. The Village does "ha[v]e the burden of showing there is evidence supporting its proffered justification," which in this case is aesthetics. *Weinberg*, 310 F.3d at 1038. And although the evidence does not need to be "overwhelming," the Village does need to show that it did more than "blindly invoke" aesthetic concerns to support its restriction on painted wall signs. *Id.* But in this case, the Village has satisfied its burden. Before the Village implemented its Sign Ordinance, it took hundreds of photographs of signs both around the village, as well as in nearby towns. R. 37-4, Exh. 1D at 160-348[8]. The Village documented the various sign styles and structures in use by the community and on several occasions made note of aesthetic preferences. *See, e.g., id.* at 326. More to the point, in a Staff Report prepared for the Village's Plan Commission, the Village specifically discussed the aesthetic problems associated with *painted* wall signs. *See* R. 36-3, Exh. C, 2015 Staff Report. The Report explains that painted wall signs "present numerous issues, including

_____

[8]The page numbers associated with this exhibit refer to the pagination in the PDF.

permanence, on-going maintenance and water damage to the underlying structure;"[9] that the typical removal processes for painted wall signs "are very caustic and can cause significant damage to the brick," "[i]n many cases" leaving a "ghost sign" on the wall; and that "[t]ired, faded, chipped wall signs painted directly onto wood or masonry are perceived by many … as presenting a negative face to the commercial vitality of the community." *Id.* at 3-5. The Report also sets forth a photographic example of what the "ghost" sign problem looks like and what the water damage problem looks like (given the Village's ban, the exemplar photos are not actually from signs in the Village). *Id.* at 4, 5. Although this Report did not come out until the Sign Ordinance was amended in 2012, it nevertheless supports the Village's conclusion that painted wall signs pose specific aesthetic problems that justify the ban in § 9.020(P). On top of all this, the Village also offers photos of Leibundguth's railway-facing, painted wall sign, and those photos do show some of the fading and chipping aesthetic problems discussed by the Staff Report. R. 36-4, Exh. D at 7-9 (photos taken on July 22, 2015). All of this evidence together shows that the Village did not blindly invoke its aesthetic concerns, but rather that it carefully documented and considered the current appearance of signs around the community and the impact different types of signs, including painted wall signs, have on the town's general appearance. The Village has provided sufficient evidence to justify its need for a restriction on painted wall signs.

---

[9]The Report explains in detail why water damage is a special problem with paint on bricks: the paint traps moisture on the brick's surface, and when the water freezes and expands, the ice shears the face of the brick. 2015 Staff Report at 4.

The Village's painted wall sign restriction is also narrowly tailored to serve the Village's interest in aesthetics. The Village spent more than a year in deliberation and dialogue with Village residents and businesses regarding the Sign Ordinance, as reflected in the Village's meeting minutes. *See, e.g.*, DSOF ¶¶ 13-14; R. 37-1, Exh. 1A at 49-104.[10] Recognizing the problems created by painted wall signs, the Village determined that the best way to eliminate the harm caused by painted wall signs was to ban them. This was probably the only effective way to address the aesthetics problem posed by painted wall signs. *See Taxpayers for Vincent*, 466 U.S. at 808 ("By banning these signs, the City did no more than eliminate the exact source of the evil it sought to remedy. … It is not speculative to recognize that [posted signs] by their very nature, wherever located and however constructed, can be perceived as an esthetic harm." (internal quotation marks and citation omitted)). In arguing to the contrary, Leibundguth does not, except for one immaterial exception, actually attempt to explain how the Village could adopt some other, narrower restriction and still serve its concern over aesthetics. Pl.'s Br. at 4-5.[11] Really, Leibundguth just argues that the Village's concerns are not genuine concerns because (1) painted murals are allowed, Pl.'s Br. at 5, and (2) the Village does not ban painting on brick walls, it just bans painted wall signs, *id.* at 4. But on the first point, this Opinion earlier explained why there is no exemption for murals.

___

[10]The page numbers associated with this exhibit refer to the pagination in the PDF.

[11]The immaterial exception is in response to the Village's unpersuasive argument that striking down the painted wall sign ban would prevent the Village from banning spray-painted signs. Pl.'s Br. at 3-4. Of course it would be narrower to ban only spray-painted signs, but luckily for the Village, the Village more broadly argues (persuasively) that the aesthetic problems posed by painted wall signs are not limited to *spray* paint. *See* 2015 Staff Report at 3-5.

*Supra* at 14-15, 15 n.6. And on the second point—which, again, is not really an argument on narrow tailoring, so much as it is an argument against the genuineness of the aesthetic concern—the Village reasonably could conclude that a sign, which is by definition a display that attracts attention (and indeed is designed to attract attention), poses a more serious aesthetic problem that just a painted wall. The Village's restriction on painted wall signs is narrowly tailored to advance its interest in aesthetics.

Moving on to the final element of the time-place-and-manner test, the parties do not dispute whether the Village's ban on painted wall signs leaves open ample alternative channels of communication, and for good reason. The Village's restriction on painted wall signs prohibits just *painted* wall signs; it does not prohibit other types of wall signs. In fact, the Sign Ordinance expressly permits residents and businesses to put up wall signs if they wish to do so, they just cannot directly paint the sign on the wall. Sign Ord. § 9.050(C). The Ordinance also allows businesses to use a variety of other types of signs, such as window signs, awning signs, and under-canopy signs. *Id.* § 9.050(F)-(H). The Village has left open ample alternative channels through which commercial entities, like Leibundguth, can advertise their businesses. This element is satisfied.

Because the Village has satisfied its burden—at least as to its interest in aesthetics—under the First Amendment, the Village's ban on painted wall signs is constitutional. The Village's motion for summary judgment is granted as to

Leibundguth's claim that the ban on painted wall signs violates the First Amendment.[12]

## B. Restriction on Wall Signs Facing a Roadway or Drivable Right-of-Way

Leibundguth's next challenge is to the Ordinance's requirement that wall signs face a roadway or drivable right-of-way. *See* Sign Ord. § 9.050(C)(1). When originally adopted, this requirement precluded those lots adjacent to the Metra railroad (like Leibundguth's) from displaying wall signs that faced the railroad but did not face a roadway or drivable right-of-way. After Leibundguth filed suit, however, the Village amended § 9.050(C). In July 2015, the Village added a provision allowing "lots with frontage along the BNSF railroad right-of-way"—like Leibundguth's—to display "one additional wall sign" facing the railroad, provided that the sign does "not exceed 1.5 square feet per linear foot of tenant frontage along the BNSF railroad right-of-way." Am. Sign Ord. § 9.050(C)(5). Due to this amendment, the Village argues, Leibundguth's claim here—that the Sign Ordinance's ban on signs facing the Metra violates the First Amendment—is moot. Def.'s Br. at 15.

---

[12]The Village suggests that in the event this Court determines that the Ordinance's restriction on painted wall signs is valid, the remainder of Leibundguth's complaint becomes moot because Leibundguth—after removing its painted wall signs—will only have one remaining sign, which meets the Ordinance's restrictions. Def.'s Br. at 14. This, however, does not moot the remainder of the complaint, because Leibundguth still currently has *all* three signs on its building. Until Leibundguth removes the painted wall signs, the company remains in violation of the restrictions in § 9.020(P) as well as the restrictions in § 9.050. What's more, Leibundguth is entitled to appeal this Court's holding that the ban on painted wall signs is valid, so even if Leibundguth removes the painted wall signs, the company can present a live, non-moot dispute because the company would want to paint the signs back onto the walls (and, in any event, perhaps Leibundguth will win a stay of the decision pending appeal). The remainder of the complaint is not moot.

The Village is correct. "[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486, 496 (1969). For claims seeking only prospective relief, the repeal of a challenged ordinance ordinarily renders that case moot "unless there is evidence creating a reasonable expectation that the City will reenact the ordinance or one substantially similar." *Fed'n of Adver. Indus. Representatives, Inc. v. City of Chicago*, 326 F.3d 924, 930 (7th Cir. 2003) (citing *Rembert v. Sheahan*, 62 F.3d 937, 940 (7th Cir. 1995), *Thomas v. Fiedler*, 884 F.2d 990, 995 (7th Cir. 1989)). *See also Zessar v. Keith*, 536 F.3d 788, 793 (7th Cir. 2008) ("[A]ny dispute over the constitutionality of a statute becomes moot if a new statute is enacted in its place during the pendency of the litigation, and the plaintiff seeks only prospective relief."). The same holds true for when a municipality amends a statute, at least so long as the amended statute "clearly rectifies the statute's alleged defects." *Rembert v. Sheahan*, 62 F.3d 937, 940-41 (7th Cir. 1995).

In this case, the Village's amended provision, § 9.050(C)(5), rectified the Sign Ordinance's alleged defect on the railroad-facing ban. The Ordinance no longer bans wall signs facing only the Metra railway. Now, lots with railroad frontage *are* allowed to display a wall sign facing the railroad even if that sign does not also face a drivable right-of-way. Am. Sign Ord. § 9.050(C)(5). Thus, Leibundguth is no longer precluded from displaying a wall sign that faces only the Metra tracks, as he complains. There is also no evidence in the record to show that the Village is likely to repeal its amended provision; in fact, Leibundguth does not even argue that the

Village is likely to reenact its ban. And while the Village did amend the ordinance to moot this claim after Leibundguth filed suit, courts have held that the altering of an ordinance in response to litigation "does not alone show the city's intent to later reenact the challenged ordinance." *Outdoor Media Group, Inc. v. City of Beaumont*, 506 F.3d 895, 901 (9th Cir. 2007). *See also Fed'n of Adver. Indus. Representatives, Inc.*, 326 F.3d at 929 (ruling that where a municipality appears to be voluntarily amending a statutory provision in order to fashion an ordinance that passes constitutional scrutiny, it is proper to presume that the municipality does not intend to reenact the same or a substantially similar unconstitutional provision). Thus, without more, there is no reasonable basis to believe that the Village will reenact its ban on wall signs facing the Metra railway. Leibundguth's claim is moot as to the declaratory and injunctive relief Leibundguth requests in its amended complaint. *Id.* ("If the plaintiff's only claims seek to require government officials to cease allegedly wrongful conduct, and those officials offer to cease that conduct, then the claims should be dismissed as moot, absent some evidence that the offer is disingenuous."). To the extent Leibundguth wishes to challenge the amended section of the Ordinance and to again request declaratory and injunctive relief on the revised Ordinance, Leibundguth must amend its complaint to do so (though there does not seem to be a practical reason to do so, at least not as to the revised Ordinance's authorization of a railroad-facing sign, as that is what Leibundguth wanted).

It is true that Leibundguth did not seek just declaratory and injunctive relief in its amended complaint. Leibundguth also sought one dollar in nominal damages in connection with "the violation of [its] constitutional rights," which presumably includes a violation resulting from the Village's ban on wall signs facing the Metra. *See* Am. Compl. ¶ D. A plaintiff who has been deprived of a constitutional right is entitled to nominal damages, as Leibundguth claims, even absent actual damages. *Hessel v. O'Hearn*, 977 F.2d 299, 302 (7th Cir. 1992). The problem for Leibundguth, however, is that the Village never did commit a constitutional violation of Leibundguth's rights because the Village never enforced its short-lived ban on signs facing only the Metra. The ban, when in effect, could have impacted only Leibundguth's painted wall sign on the back of its building; the sign facing the Metra. But that sign was in place before the ordinance was enacted, remained in place after the enactment, and still remains in place today. Leibundguth was not required to change it; Leibundguth was never precluded from speaking through that sign; and importantly, Leibundguth was never fined for having a non-conforming sign when the ban was in effect. Rather, the Village agreed not to fine Leibundguth during this case's pendency. R. 10. So long as the Village will not fine Leibundguth for having a Metra-facing sign during the time the ban was in effect, Leibundguth's request for nominal damages is likewise moot. *See Freedom from Religion Found., Inc. v. City of Green Bay*, 581 F. Supp. 2d 1019, 1029-33 (E.D. Wis. 2008). *See also Carey v. Piphus*, 435 U.S. 247, 266 (1978) (explaining that nominal damages are

available to "vindicate[] deprivations of certain 'absolute' rights that are not shown to have caused injury"). Accordingly, the Court dismisses this claim as moot.

**C. Restriction on Total Sign Area and the Number of Permitted Wall Signs**

Leibundguth's next challenge is to the ordinance's restriction on the total signage area allowed under § 9.050(A), and on the number of wall signs permitted under § 9.050(C). Section 9.050(A) limits the maximum allowable signage area per lot to "1.5 square feet per linear foot of tenant frontage" for buildings which are set back 300 feet or less "from the abutting street right-of-way," and "2 square feet per linear foot of tenant frontage" for buildings set back more than 300 feet. *See* Sign. Ord. § 9.050(A). Section 9.050(C), which applies just to *wall* signs, limits the number of wall signs a "business or property owner" may display to "one wall sign per tenant frontage along a public roadway or drivable right-of-way." *Id.* § 9.050(C)(1). According to Leibundguth, these size and number restrictions violate the First Amendment because they do not serve even a rational government interest, are not narrowly tailored, and are not the least extensive means necessary to achieve the Village's interests. Am. Compl. ¶¶ 91-94. Leibundguth challenges these restrictions both on their face and as applied. The Court will address Leibundguth's as applied challenge first, and its facial overbreadth challenge second.

As a threshold matter, the Court must determine the proper framework to use in analyzing these restrictions. As the Court explained in its April 2015 order addressing the Village's motion to dismiss, the appropriate level of scrutiny here is

intermediate scrutiny. R. 29, April 2015 Order, at 17-19; *see also Central Hudson Gas & Elec. Corp. v. Public Svc. Comm'n*, 447 U.S. 557, 562 (1980). Both parties agree that as far as the restrictions in § 9.050 are concerned, they restrict only commercial speech. The Village adopted this position in its motion to dismiss briefing, *see* R. 25 at 4 (explaining that "only three specific commercial sign regulations prohibit [Leibundguth's] commercial signs"); and neither party disputes it now, *see* Def's Br. at 15; Pl's Br. at 5. Commercial speech, although of course worthy of First Amendment protection, is entitled only to intermediate scrutiny, *see Central Hudson*, 447 U.S. at 562; therefore, the restrictions in § 9.050 need only satisfy the requirements of the Supreme Court's *Central Hudson* test in order to be valid under the First Amendment, *see id.*

Before addressing the merits of the Village's restrictions under *Central Hudson*, however, it is worth discussing a recent Supreme Court decision that was issued after this Court's opinion on the dismissal motion. In *Reed v. Town of Gilbert*, 135 S. Ct. 2218 (2015), the Supreme Court held that a town's sign code was unconstitutionally content-based because it applied different restrictions to signs depending on the sign's content. 135 S. Ct. at 2231-32. In *Reed*, a majority of the Supreme Court explained that a speech regulation would be considered content-based in one of two ways: first, if the regulation, on its face, "applies to particular speech because of the topic discussed or the idea or message expressed," then that regulation is content-based. *Id.* at 2227. This is so "even if the regulation does not discriminate among viewpoints within that subject matter." *Id.* at 2230. Second, if a

regulation is facially neutral, but cannot be "justified without reference to the content of the regulated speech" or was "adopted by the government because of disagreement with the message the speech conveys," then that regulation is likewise content-based. *Id.* at 2227 (internal quotations omitted). Applying these principles to the town's sign code in *Reed*, the Supreme Court concluded that the distinctions the code drew between different types of signs—for example, Ideological Signs, Political Signs, and Temporary Directional Signs—were content-based because they "depend[ed] entirely on the communicative content of the sign," *id.* at 2227, and that because the code favored certain kinds of speech (*e.g.*, ideological signs) over other kinds of speech (*e.g.*, temporary directional signs), its restrictions had to be subject to strict scrutiny, *id.* at 2227-31.

Given how recently *Reed* was decided, its reach is not yet clear. Although *Reed* broadly states that content-based restrictions must be subject to strict scrutiny, *see id.* at 2231, even if there is no viewpoint discrimination and even if the speech regulation differentiates just as to particular *topics*, it remains to be seen whether strict scrutiny applies to *all* content-based distinctions. As pertinent here, the question would be whether strict scrutiny applies to *commercial*-based distinctions like those at issue in § 9.050(A) and (C). There are certain broad statements in *Reed* that could be read that way, *see id.* at 2226 ("Content-based laws [are] unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests."), but other statements tug the other way, *id.* at 2232 ("Not all distinctions are subject to strict

scrutiny, only content-based ones are."). Yet the concurring opinions warn that the majority's test for how to tell what is content-based and what is not could result in commercial-speech regulation being deemed content-based. *See id.* at 2235 (Breyer, J., concurring in judgment) ("Nor can the majority avoid the application of strict scrutiny to all sorts of justifiable … regulations by relying on this Court's many subcategories of exceptions to the rule," such as, "for example, … commercial speech."); *id.* at 2236 (Kagan, J., concurring in judgment) ("Says the majority: When laws single out specific subject matter, they are facially content based; and when they are facially content based, they are automatically subject to strict scrutiny."). But the majority never specifically addressed commercial speech in *Reed*, which is not surprising, because the Supreme Court did not need to address that issue: all of the restrictions at issue in *Reed* applied only to *non*-commercial speech. What is important for this case is that, absent an express overruling of *Central Hudson*, which most certainly did not happen in *Reed*, lower courts must consider *Central Hudson* and its progeny—which are directly applicable to the commercial-based distinctions at issue in this case—binding. *See Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989) ("If a precedent of th[e] [Supreme] Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court … should follow the case which directly controls, leaving to th[e] [Supreme] Court the prerogative of overruling its own decisions."). Accordingly, notwithstanding any broad statements in *Reed*, the

restrictions in § 9.050(A) and (C) still only need to survive *Central Hudson's* intermediate scrutiny test.

With the proper test identified, it is time to apply it. *Central Hudson* lays out a four-step analysis for determining whether restrictions on commercial speech are valid under the First Amendment. *Central Hudson*, 447 U.S. at 566. First, for commercial speech to even be entitled to First Amendment protection, *Central Hudson* instructs that the speech must not itself comprise unlawful activity (such as being fraudulent) and must not be misleading. *Id.* If the speech satisfies this requirement, then the burden falls on the government to show (1) that its asserted interest in regulating the speech is "substantial," (2) that its regulation "directly advances" the government's asserted interest, and (3) that its regulation is "not more extensive than is necessary to serve that interest." *Id.*

As to the threshold element, Leibundguth's commercial speech—its signs advertising its business—are entitled to First Amendment protection. Leibundguth's signs concern a lawful activity: moving and storage; and they are not false or misleading. Before conducting discovery, the parties did not dispute whether Leibundguth's signs were truthful. Now, however, the Village asserts that one of Leibundguth's signs is false and misleading—the sign on the back of Leibundguth's building facing the Metra—because it misidentifies the name of Leibundguth's partner company, Wheaton World Wide Moving. *See* Def.'s Br. at 16. The Village points out that the sign announces the partner-company name as Wheaton World Wide *Movers*, when in fact the company's name is Wheaton World

Wide *Moving*. *Id.*; DSOF ¶ 25. Maybe a very discerning grammarian would wonder whether the noun "Movers" is equivalent to the gerund "Moving" (or is "Moving" a present participle in the sign?) But to every other observer, this slight difference is not false or misleading, at least not in the commercial-speech sense. The requirement that commercial speech not be false or misleading is designed to protect consumers from deceit or misinformation. *See Central Hudson*, 447 U.S. at 563. The Village does not dispute that there is no registered company under the name Wheaton World Wide Movers, *see* Pl.'s Br. at 6, so Leibundguth is not trying to feed on the reputation of another company. Nor has the Village otherwise submitted any evidence showing that anyone is likely to be misled by this error, or tricked into thinking Leibundguth has a relationship with one moving company when in reality it has a relationship with another. Because none of Leibundguth's signs are false or likely to deceive the public, they are all entitled to First Amendment protection. *Central Hudson*, 447 U.S. at 563 (explaining that there is no constitutional problem with banning "communication [that is] more likely to deceive the public than inform it"); *see also In re R.M.J.*, 455 U.S. 191, 203 (1982) (explaining that for *Central Hudson* purposes, "inherently misleading" advertising "may be prohibited entirely").

Moving on to the next element, the question is whether the interests the Village advances—traffic safety and aesthetics—are substantial. It is well settled that they are. *See Metromedia, Inc.*, 453 U.S. at 508 ("Nor can there be substantial doubt that the twin goals that the ordinance seeks to further—traffic safety and the

appearance of the city—are substantial government goals."); *see also Taxpayers for Vincent*, 466 U.S. at 806 (recognizing that towns may ban certain signs in furtherance of a "weighty" interest "in proscribing intrusive and unpleasant formats for expression"). To be sure, Leibundguth disputes whether the record shows that those problems are actually posed by the size and number of signs targeted by the ordinance, and that dispute is discussed next, but this part of *Central Hudson* is satisfied because aesthetics and traffic safety qualify as substantial government interests.

The third element of *Central Hudson* asks whether the Village's restrictions in § 9.050(A) and (C) directly advance the Village's proffered interests in traffic safety and aesthetics. A regulation infringing commercial speech "may not be sustained if it provides only ineffective or remote support for the government's purpose." *Edenfield v. Fane*, 507 U.S. 761, 770 (1993) (quoting *Central Hudson*, 447 U.S. at 564). Put differently, this burden "is not satisfied by mere speculation or conjecture; rather the governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Id.*; *see also Greater New Orleans Broadcasting Ass'n, Inc. v. United States*, 527 U.S. 173, 188 (1999). It is here that the Village's restrictions falter, although only in part and not fatally. On the Village's purported interest in traffic safety, the Village has failed to provide sufficient evidence to prove that the signs of the targeted size and number pose a traffic-safety problem, or to show that the Village's restrictions advance its interest

in traffic safety "in any direct [or] material way." *Edenfield*, 507 U.S. at 771. The Village has not provided any studies, police reports, or even anecdotal stories to show that the traffic harms it recites are real. *See id.* (concluding that the regulations at issue were not narrowly tailored to serve the Board's purported interests where the Board presented no studies or anecdotal evidence to show that its interest was advanced by its restrictions, and where many states failed to impose a similar restriction). Nor has it produced any evidence demonstrating that restricting the size and number of commercial signs, but not other signs (*e.g.*, non-commercial flags, governmental signs, or decorations temporarily displayed in connection with a Village-sponsored event, *see* Sign Ord. § 9.030), will alleviate this alleged harm to a material degree. *See City of Cincinnati v. Discovery Network*, 507 U.S. 410, 424 (1993) (rejecting purported interest where distinction between commercial and noncommercial speech bore "no relationship whatsoever to the particular interests that the city has asserted"). Without any evidence showing that the targeted signs pose a traffic safety problem, the Village cannot show that its restrictions in § 9.050 directly advance that interest. *See Pearson v. Edgar*, 153 F.3d 397, 402 (7th Cir. 1998).

It is true that the Village attaches treatises and sign-industry publications to its brief, which it asserts shows that sign regulations—like those at issue in § 9.050—directly impact traffic safety. *See* R. 38-13, Exh. 14, Treatises. But the real problem with the Village's presentation is that it fails to develop any actual argument based on these treatises or to explain how these treatises support its

contention that traffic safety is a real problem for the Village. In one sentence—and one sentence only—the Village proffers that these treatises show that "limiting the size and number of signs *can* enhance traffic safety and aesthetics," Def.'s Br. at 17 (emphasis added), but the fact that such restrictions *can* improve traffic safety does not show that the traffic safety harms the Village recites are real or that the Village's restrictions in § 9.050 operate to alleviate those harms to a material degree. Without a developed argument, actually analyzing the underlying treatises and publications, the Court cannot accept "speculation or conjecture" as proof that the Ordinance's restrictions advance the Village's interest in traffic safety. *Edenfield*, 507 U.S. at 770-71. Accordingly, these treatises do not save the Village's traffic safety interest.

The Village also cites to several sign codes from surrounding towns, suggesting that because those towns imposed size and number restrictions in the name of traffic safety, the Village's interest in traffic safety must likewise be real. Def.'s Reply and Resp. Br. at 9. But the Village's argument again falls short. In order for these other sign codes to provide the support the Village needs here, those codes must do more than simply cite traffic safety as a governmental interest (which is exactly what the Village has done here), they must provide some sort of evidence showing that traffic safety is advanced by restrictions like the ones the Village has imposed here. To be sure, this evidence need not be extensive; it can be in the form of studies performed by those other locales or even by anecdotes from those towns. *See Lorillard Tobacco v. Reilly*, 533 U.S. 525, 555 (2001) (noting that

"litigants [can] justify speech restrictions by reference to studies and anecdotes pertaining to different locales altogether, or even, … [by] relying on history, consensus, and 'simple common sense'"). But simply noting that other locales cite to traffic safety in their sign codes is insufficient. The Village has failed to point the Court to anywhere in those sign codes showing the existence of a relationship between traffic safety and regulations limiting the size and number of signs. And again, absent some sort of evidence showing that the Village's restrictions in § 9.050(A) and (C) alleviate to at least some degree the Village's interest in traffic safety, the Village's restrictions in § 9.050(A) and (C) cannot be said to directly advance that interest.

The Village's interest in aesthetics, however, saves the Sign Ordinance. Unlike with its interest in traffic safety, the Village does have a sufficient basis for believing that its restrictions in § 9.050(A) and (C) help "enhance the physical appearance of the Village"—one of the alleged goals of the Village's Sign Ordinance. Sign Ord. § 9.010(A)(3). As noted earlier in the Opinion, before enacting the Ordinance, the Village took hundreds of pictures of commercial signs around the community, spoke with several village members regarding the different signage currently in use by town residents and businesses, and even took pictures of signs in surrounding communities for comparison purposes. R. 37-4, Exh. 1D at 160-348; DSOF ¶¶ 13-14. Because the Village spent time studying the appearance of signs in its town (as well as in other towns), the Village knew how the town's commercial signs looked and how it wanted to change those signs to improve the town's overall

aesthetic appeal. This shows that the aesthetic harms the Village cites are not just mere conjecture, but rather that they are real harms that can be alleviated by placing restrictions on the size and number of signs that may be placed on buildings in the village. *See Metromedia*, 453 U.S. at 510 ("It is not speculative to recognize that billboards by their very nature, wherever located and however constructed, can be perceived as an 'esthetic harm.'"); *Taxpayers for Vincent*, 466 U.S. at 807 (concluding that a complete ban on the posting of signs on public property directly advanced a town's interest in preventing visual clutter); *see also View Outdoor Advertising, LLC v. Town of Schererville Bd. of Zoning Appeals*, 86 F. Supp. 3d 891, 895 (N.D. Ind. 2015) (finding that a ban on commercial billboards directly advanced a town's interest in aesthetics). Accordingly, the Village's restrictions in § 9.050(A) and (C) directly advance its stated interest in improving the town's aesthetics.

The Village's restrictions in § 9.050(A) and (C) are also narrowly tailored to serve the Village's interest in aesthetics. This last part of the *Central Hudson* analysis asks whether the Village's restrictions are no more extensive than necessary to further the Village's purported interest. To satisfy this prong, the Village need not show that its restrictions are "the least restrictive means conceivable," or that they are a "perfect" fit. *Greater New Orleans Broadcasting Ass'n, Inc. v. United States*, 527 U.S. 173, 188 (1999). Rather, all that the Village must show is that there is a "fit between the … ends and the means [that it] chose[] to accomplish those ends." *Am. Blast Fax, Inc.*, 323 F.3d at 658-59 (citing *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 632 (1995). The Village has done this.

Municipalities, like the Village, are generally given "considerable leeway ... in determining the appropriate means to further a legitimate governmental interest, even when enactments incidentally limit commercial speech." *South-Suburban Housing Ctr. v. Greater South Suburban Bd. of Realtors*, 935 F.2d 868, 897 (7th Cir. 1991) (citing *Bd. of Trustees of State Univ. of New York v. Fox*, 492 U.S. 469, 478-79). In this case, the Village chose to limit the total sign area, § 9.050(A), and the number of commercial wall signs a building may display, § 9.050(C). The Village did not go so far as to completely ban wall signs (except painted ones) or commercial signs altogether; nor is there evidence in the record to suggest that the Village's restrictions in § 9.050 are likely to have a detrimental impact on a business' ability to effectively advertise to consumers. *Id.* In fact, the Village's Sign Ordinance still permits a business to advertise in a variety of ways, including not only through wall signs, but also through window signs, awning signs, vehicle signs, and sandwich board signs.[13] *See generally* Sign Ord. § 9.050. The Village's decision to limit the total sign area and number of wall signs a commercial business may display is thus narrowly tailored to serve the Village's interest in enhancing the town's overall appearance. A reasonable fit exists between the Village's ends—improving town

---

[13]Leibundguth points to the Ordinance's allowance of other signs in unlimited numbers to suggest that the Ordinance's restrictions in § 9.050 are not narrowly tailored. *See* Pl.'s Br. at 12. But this point is not persuasive. As the Court noted above, this last element of the *Central Hudson* analysis merely requires a reasonable fit between the Village's goal—improving town aesthetics—and its chosen means—reducing total signage area and the number of wall signs permitted. It does *not* require that the restrictions implemented by the Village be a perfect fit or the least restrictive means possible. *See Members of the City Council of Los Angeles*, 466 U.S. at 815-16. It is sufficient that the Village's aesthetic goals are directly advanced by its restrictions in § 9.050 and that those restrictions are an "effective approach" to solving the problem before the Village. *Metromedia*, 453 U.S. at 508.

aesthetics—and the means the Village chose to accomplish those ends—restricting the size and number of commercial signs.

Leibundguth argues that the Village's interest in community aesthetics cannot be considered narrowly tailored because the Village was willing to exempt one company, Art Van Furniture, from having to abide by § 9.050's restrictions. Pl.'s Br. at 8. According to Leibundguth, the Village's willingness to make such an exception demonstrates that the Village's restrictions in § 9.050(A) and (C) are impermissibly underinclusive. *Id.* It is true that a restriction on speech can be underinclusive, and therefore, invalid, when it has exceptions that undermine and counteract the interest the town claims its restrictions further. *See Vanguard Outdoor, LLC v. City of Los Angeles*, 648 F.3d 737, 742 (9th Cir. 2011); *see also View Outdoor Advertising, LLC*, 86 F. Supp. 3d at 896. But exceptions should also not be "viewed in isolation" or "parsed too finely." *Vanguard Outdoor, LLC*, 648 F.3d at 742. In this case, the Village's decision to grant one company a variance to § 9.050's restrictions does not undermine the Village's overall interest in advancing its community appearance. The Village's restrictions in § 9.050(A) and (C) still effectively advance the Village's interest in aesthetics.

Because the Ordinance's restrictions in § 9.050(A) and (C) satisfy the requirements outlined in *Central Hudson*, the restrictions do not run afoul of the First Amendment. Accordingly, Leibundguth's as applied challenge fails. The Village's restrictions in § 9.050(A) and (C) may stand.

All that remains then is Leibundguth's final argument: its facial challenge. Leibundguth frames its challenge as an overbreadth attack. Pl.'s Br. at 16. It contends that even if the Village's restrictions in § 9.050(A) and (C) "might be constitutionally applied to Leibundguth" (that is, might pass muster as restrictions on commercial speech), the restrictions may nonetheless "conceivably be applied unconstitutionally to others," (that is, to noncommercial speakers) and thus, must be deemed "invalid" in "all [their] applications." *Id.* In making this argument, Leibundguth relies not only on § 9.050, but also on § 9.030 of the Village's Ordinance. Section 9.030 is what Leibundguth identifies as the "noncommercial" counterpart to § 9.050's restrictions on commercial signs. R. 47, Pl.'s Reply Br. at 17. As discussed previously, Section 9.030 exempts certain signs, depending on their content, from needing to obtain a permit and then subjects those exempted signs to a variety of size and number restrictions, which are different than the size and number restrictions found in § 9.050 for commercial signs. Sign Ord. § 9.030. For example, it exempts noncommercial and political signs from needing to obtain a permit, but then restricts those signs to a "maximum area of 12 square feet per lot" and requires that they not be in "the public right-of-way." *Id.* § 9.030(I). It likewise exempts governmental signs and noncommercial flags, but then does not impose any size or number restrictions on those signs. *Id.* § 9.030(A) and (G). Leibundguth contends that the content-based distinctions the Ordinance draws between different noncommercial signs in § 9.030, requires that *all* of the Ordinance's size and

number restrictions (in both § 9.030 and § 9.050) be subject to strict scrutiny—a level of scrutiny, Leibundguth argues, the Village cannot meet. Pl.'s Br. at 18-20.

Leibundguth, however, is not entitled to invoke the overbreadth doctrine in this way, because the parties agree that § 9.050 applies *only* to commercial speech. The overbreadth doctrine is designed to give a litigant, who has been injured under one provision of an ordinance, standing to bring a facial challenge to vindicate the constitutional rights of another litigant not currently before the court who may also have been injured under *that* same provision. *Alexander v. United States*, 509 U.S. 544, 555 (1993); *see also CAMP Legal Defense Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1273-74 (11th Cir. 2006). In the case of a commercial litigant then, like Leibundguth, the First Amendment's overbreadth doctrine can be used by that commercial litigant to challenge an ordinance that might be constitutionally applied to it, but unconstitutionally applied to a noncommercial litigant. *Bd. of Trustees of State Univ. of New York v. Fox*, 492 U.S. 469, 481 (1989). The problem for Leibundguth, of course, is that because § 9.050 does *not* apply to noncommercial speakers, there is no overbreadth challenge to be had. A *non*-commercial litigant will never be subject to § 9.050's requirements, because those requirements apply only to *commercial* speakers; therefore, there are no non-party rights to assert here. And although Leibundguth can point to § 9.030 to *inform* whether § 9.050—the section that applies to Leibundguth—is content-neutral, Leibundguth cannot *challenge* under the overbreadth doctrine an entirely different section of the Ordinance—like § 9.030—which does not apply to it. *See CAMP Legal Defense*

*Fund, Inc.*, 451 F.3d at 1273-74 ("The overbreadth doctrine allows CAMP to mount a facial challenge to provisions of the Festivals Ordinance that harm its ability to hold a festival … [But] [n]othing in the overbreadth doctrine allows CAMP to challenge provisions wholly unrelated to its activities."); *see also Brazos Valley Coal. for Life v. City of Bryan*, 421 F.3d 314 (5th Cir. 2005); *Lamar Adver. of Pa., LLC v. Town of Orchard Park*, 356 F.3d 365 (2d Cir. 2004). Accordingly, Leibundguth's facial challenge also fails.[14]

### IV. Conclusion

The Court holds that the Village's restriction on painted wall signs in § 9.020(P) is a valid content-neutral time, place, and manner restriction. This restriction is valid under the First Amendment and may remain in place. The Village's restrictions in § 9.050(A) and (C) may likewise remain in place, as those restrictions, which apply only to commercial speech, satisfy the *Central Hudson* test. Accordingly, the Court grants the Village's motion for summary judgment, and denies Leibundguth's.

---

[14]If Leibundguth's facial challenge survived, and strict scrutiny applied to both § 9.030 and § 9.050, then the Village's restrictions would in all likelihood fail to survive that level of scrutiny. To survive strict scrutiny, the Village would need to show that its restrictions in § 9.050, as well as its restrictions in § 9.030, further "a compelling state interest and [are] narrowly drawn to achieve that end." *Arkansas Writers' Project, Inc. v Ragland*, 481 U.S. 221, 231 (1987); *see also Reed*, 135 S. Ct. at 2231; *Billings v. Madison Metro. Sch. Dist.*, 259 F.3d 807, 815 (7th Cir. 2001). The Village—at least on this record—very likely has failed to make that showing. For example, it is questionable whether the Village's interests in traffic safety and aesthetics are sufficiently *compelling* to satisfy strict scrutiny. *See Neighborhood Enterprises, Inc. v. City of St. Louis*, 644 F.3d 728, 738 (8th Cir. 2011), *cert. denied*, 132 S. Ct. 1543 (2012) (ruling that "a municipality's asserted interests in traffic safety and aesthetics, while significant, have never been held compelling"); *but see Solantic, LLC v. City of Neptune Beach*, 410 F.3d 1250, 1267 (11th Cir. 2005) (holding that while the city's "asserted interests in aesthetics and traffic safety" are not "compelling" in this instance, "[w]e do not foreclose the possibility that [they] may in some circumstances constitute a compelling government interest").

As mentioned earlier, the Village has agreed to not impose any fines against Leibundguth during the case's pendency. Because this Opinion brings the case to a close in the district court, it is conceivable that the Village now will seek to start the meter running in fines, even if Plaintiffs plan to appeal. But to give both sides time to consider this Opinion and make deliberative decisions on whether to appeal and whether to agree to a continued stay of the imposition of fines if an appeal were to be filed (including a possible agreement by the parties to expedite (or at least move promptly) appellate briefing in exchange for not imposing fines during the appeal's pendency), the Court on its own motion enters a temporary stay of judgment so that the fines will not accumulate during the deliberative process. The temporary stay will expire on December 28, 2015, by which time hopefully the parties will have entered into an agreement concerning the pace of an appeal and the stay of fines during an appeal. If no agreement is reached, then Plaintiffs must file a motion to extend the stay during the appeal by December 28, 2015. If a stay motion is filed, then the stay will automatically be decided until after briefing and a decision on the stay motion.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: December 14, 2015